IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JAMES HEAD,<br><br>        Plaintiff,<br>v.<br><br>DR. KENNON TUBBS et al.,<br><br>        Defendants. | **MEMORANDUM DECISION & ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:12-cv-00596<br><br>Judge Dale A. Kimball |

Plaintiff, James Head, an inmate at Utah State Prison (USP), filed this *pro se* civil rights suit. *See* 42 U.S.C.S. § 1983 (2014). The Court now grants Defendants' summary-judgment motion.

## ANALYSIS

### I. Background

Plaintiff asserts Eighth Amendment cruel-and-unusual-punishment claims of inadequate medical care. Specifically, Plaintiff alleges that Defendants were deliberately indifferent when (1) Defendant Dr. Tubbs did not (a) properly assess Plaintiff's pain and (b) give Plaintiff a bottom-bunk clearance; (2) Defendant Dr. Roberts stopped Plaintiff's pain medication and made Plaintiff use unstable legs; and (3) John Does 1-10 (the Committee) denied Plaintiff bottom-bunk and -tier clearance. (Compl. ¶ 20.) Plaintiff's Complaint seeks compensatory and punitive damages, attorney fees, costs, and release from prison.

As ordered, Defendants submitted a *Martinez* report, including over 1000 pages of medical records from both USP and University of Utah Medical Center (UMC), as well as sworn affidavits of Defendants Tubbs and Roberts. ([Doc. No. 27](#)). Defendants also filed a summary-judgment motion. Plaintiff's response, to the *Martinez* report and Defendants' Motion for Summary Judgment, cites to portions of Plaintiff's medical records.

The Court's initial review of Plaintiff's claims reveals that the Committee members were never separately identified and served. Therefore, John Does 1-10, comprising the Committee, are dismissed. Further, one of Plaintiff's requests for relief is release from prison. This inappropriate form of relief--in this civil-rights case--is therefore denied out of hand.

## II. Summary-Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [Fed. R. Civ. P. 56(a)](#). Factual assertions may be supported by

> citing to parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* at 56(c)(1). A primary purpose of the summary-judgment rule "is to isolate and dispose of factually unsupported claims or defenses." [*Celotex v. Catrett,* 477 U.S. 317, 324 (1986)](#).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the record which show an absence of

evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* Rule 56(e) requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.* 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted). The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992). Mere allegations and references to the pleadings will not suffice. However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### III. Factual Record

The facts summarized here are drawn from Defendants' *Martinez* report, namely supporting Declarations of Defendants Tubbs and Roberts. Plaintiff did not file any other material evidence himself but instead referred to his medical records supplied in the *Martinez* report to support his limited arguments against summary judgment. The material facts are undisputed, whether they are the details of medical records or expert opinion offered by Defendant doctors. The Court deems the included background information not directly related to

Defendants as relevant because it was included in Plaintiff's medical records to which Defendants had access and which informed Defendants' treatment of Plaintiff.

Plaintiff has been in the custody of the Utah Department of Corrections since October 31, 2001. Before imprisonment, Plaintiff injured his back and had a history of back pain.

On June 30, 2010, Plaintiff reported pain in his back, arms and legs to Nurse Charlton who was working at USP. He requested a bottom-bunk clearance. Under USP policy, when an inmate requests a specific clearance from a medical provider, such as a bottom bunk, the provider has discretion to make the decision then. If a provider can identify a medical condition justifying the requested clearance, the accommodation is provided. Ostensibly unable to identify a medical condition justifying the request, Nurse Charlton denied Plaintiff a bottom bunk.

If, as here, a provider denies a medical-clearance request, the request is submitted to the Medical Clearance Committee (Committee) for further review. Medical clearances for inmates are reviewed and ultimately decided by the Committee. The Committee is comprised of USP physicians and physician assistants. The Committee meets weekly. On July 7, 2010, the Committee reviewed Plaintiff's medical history and medical records and affirmed Nurse Charlton's denial of clearance for a bottom bunk. Like Nurse Charlton, the Committee found that there was no identified medical condition justifying the requested accommodation.

Citing joint pain in "bilat[eral] arms and bilat[eral] legs," Plaintiff submitted another request for a bottom-bunk clearance on July 9, 2010.

He was seen and treated by Mark Mook, Emergency Medical Technician (EMT), on July 22, 2010. That day, Plaintiff complained of lower back and left-leg pain, stating his pain started at 2:00 a.m. Based on Plaintiff's report and the EMT's examination, Plaintiff was sent to the

infirmary. There, Plaintiff was treated by Defendant Tubbs, who examined Plaintiff and prescribed Ultram, Tramadol, HCL and Flexril for ten days. He told Plaintiff to rest his back.

Plaintiff submitted a sick-call request and was treated by Logan S. Clark, PA on July 30, 2010. He reported that since returning to housing, he had difficulty walking and increased pain. He further said he had been unable to get to the medication room or dinner for the past few days. Reporting chronic and intensifying pain, Plaintiff was admitted to the infirmary for bed rest, observation and a lumbar x-ray, scheduled for Monday, August 4, 2010. Darvocet was also added to his medications to help him manage pain. The infirmary beds are all single beds and, thus, are only "bottom bunks."

While in the infirmary, on July 31, 2010, Plaintiff was treated by Nurse Earnshaw. Plaintiff complained of left lower back and left thigh pain, in addition to numbness and lack of reflex in his left leg, from his thigh to his foot.

On August 1, 2010, Plaintiff was treated by Tim Langley, P.A. Plaintiff reported persistent pain in his lower back and numbness in his left leg. That same day, Plaintiff's medical condition was also assessed by Nurse Earnshaw. Plaintiff reported he had to actively lift his leg into bed with both arms to move it. Plaintiff appeared to be hunched forward when ambulating. Plaintiff stated that he took his prescribed pain medications every afternoon. More bed rest was prescribed, but Plaintiff reported no improvement in his back pain after a weekend of bed rest. Accordingly, Plaintiff was scheduled for more radiological imaging. Plaintiff said his prescribed pain medications were controlling his pain.

Plaintiff was again assessed by Nurse Johnson on August 4, 2010. Nurse Johnson consulted with Defendant Tubbs, who consulted with Plaintiff. On August 4, 2010, Defendant

Tubbs requested x-rays of Plaintiff's lumbar spine. The results of the x-rays showed: "lumbar spine show minimal anterolisthesis of L4 on L5. There is mild endplate spurring in themed lumbar region with moderate to severe facet arthropathy in the inferior 2 levels. SI joints are minimally arthritic." On August 4, 2010, Defendant Tubbs ordered magnetic resonance imaging (MRI) of Plaintiff's lumbar spine due to neuropathy and numbness of both lower extremities.

The next day, August 5, 2010, Plaintiff was taken to UMC for an MRI and later admitted for surgery for L2-L3 disc rupture. Plaintiff underwent surgery for a L2-3 discectomy on August 6, 2010. Following surgery, Plaintiff was returned to the USP infirmary on August 7, 2010.

Defendant Roberts treated and assessed Plaintiff on August 16, 2010. Plaintiff reported he may be getting back some use of his right leg. Plaintiff further stated he did not feel ready to leave the infirmary. Defendant Roberts allowed Plaintiff to remain in the infirmary for further rest and observation.

Defendant Roberts treated and assessed Plaintiff on August 18, 2010. Plaintiff stated he called for help; he could see the word "help" in his brain but he could not get the word out; all he could do was jabber. Defendant Roberts prescribed Valium to help Plaintiff calm down, as Defendant Roberts believed Plaintiff was having an acute panic attack.

Plaintiff remained an inpatient in the USP infirmary until August 24, 2010, when he was transferred to a bottom bunk bed in a regular housing unit. On August 26, 2010, Dr. Richard Garden, the Administrative and Clinical Director over health services for UDOC, formally authorized a bottom-tier and bottom-bunk clearance for Plaintiff. Plaintiff has continually been assigned a bottom bunk since his return to regular housing.

Plaintiff started a prescribed program of physical therapy on August 27, 2010. Defendant Roberts treated and assessed Plaintiff on October 13, 2010. Plaintiff complained of hip pain. Defendant Roberts noted atrophy in Plaintiff's quadriceps and loss of muscle mass in his thigh, which Defendant Roberts believed was causing the hip pain. Plaintiff was still using a wheelchair. It was Defendant Robert's medical opinion that inactivity was causing Plaintiff's muscles to atrophy which, in turn was causing pain. Thus, Defendant Roberts prescribed a controlled routine of exercise, movement and a centrally acting analgesic to control pain. Specifically, Dr. Roberts prescribed a ten-day refill of Tramadol to control pain and physical therapy three times a week.

Defendant Roberts' treatment proved effective, as Plaintiff's condition greatly improved. After several physical therapy sessions over the course of about thirty days, Plaintiff could walk on his own using normal gait pattern. His balance was good; and he was able to stand and sit, change directions, and start and stop without help. At the end of his walking exercises, Plaintiff was not tired and showed normal respiratory rate.

On December 1, 2010, Plaintiff submitted a medical-visit request, complaining of a "severe stiff neck." Defendant Roberts assessed and treated Plaintiff again on December 7, 2010, when Plaintiff reported he had had pain in his neck for eighteen years and noted he had been in a mining accident before imprisonment. Plaintiff also said he had been having seizures just before sleeping. Defendant Roberts' treatment for Plaintiff's conditions included: (1) 600 mg. Gabapentin daily to control seizures; (2) a radiological examination of Plaintiff's cervical spine, which showed no big change from his pre-surgery CT cervical spine scan done on August 5, 2010; and (3) a return to physical therapy, which again improved Plaintiff's condition.

Five months later, on January 5, 2011, Plaintiff complained of neck pain and showed myelopathic signs including hand and leg weakness. Plaintiff underwent a cervical MRI on January 11, 2011 at the UMC. On February 23, 2011, Plaintiff was seen by in the Neurosurgery Department at UMC and scheduled for a C3-C4 and C4-C5 anterior cervical discectomy and fusion on March 25, 2011. On March 25, 2011, Plaintiff underwent the C3-C4 and C4-C5 anterior cervical discectomy and fusion. During a six-month follow-up, on September 16, 2011, via a telemedicine conference with the Clinical Neurosciences Center at the University of Utah, Plaintiff reported excellent progress. He further said he was doing physical therapy five times per month and aerobic exercises two-to-three times per week.

## IV. Summary Judgment Analysis

### A. Legal Standard for Denial of Medical-Care Claims

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976) (joint opinion)). "'Deliberate indifference' involves both an objective and a subjective component. The objective component is met if the deprivation is 'sufficiently serious.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A medical need is serious enough "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999) (quotation marks & citation omitted). The subjective component is met only if a prison official "knows of and disregards an excessive risk to inmate

health or safety." *Farmer*, 511 U.S. at 837. Allegations of mere negligence in diagnosing or treating a medical condition, *Estelle*, 429 U.S. at 106, or "inadvertent failure to provide adequate medical care," *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996) (quotation marks & citation omitted), are insufficient to state a claim under the Eighth Amendment.

## B. Insufficiency of Plaintiff's Evidence

Defendants' motion for summary judgment asserts that the evidence here shows Plaintiff was not denied adequate medical care and that Defendants were not deliberately indifferent to Plaintiff's medical needs. Defendants' motion is supported by their *Martinez* report which includes Plaintiff's extensive medical records and the sworn affidavits of Defendants Tubbs and Roberts. The Court has thoroughly reviewed these documents which show that Plaintiff has received extensive treatment for his various ailments, including numerous doctor visits, regular outside consultations, multiple MRIs as well as other diagnostic imaging procedures, surgical procedures, consistent physical therapy and pain-management treatments.

Based on this evidence, the Court concludes that Defendants have met their initial burden on summary judgment of showing that there is an absence of evidence to support Plaintiff's claim of cruel and unusual punishment. Thus, the burden rests squarely with Plaintiff to come forward with admissible evidence showing there is a genuine issue of material fact which precludes summary judgment for Defendants.

Plaintiff has not met his burden of proof in this case. Not only has Plaintiff failed to produce any contrary evidence to support his allegations that he was denied proper medical diagnosis and treatment he has also failed to show that Defendants were deliberately indifferent to his medical needs. In fact, the extensive medical records in this case show that Defendants

have been solicitous of Plaintiff's medical needs. Though Plaintiff may quibble with some delays, those were only a matter of a few days at a time and can inarguably be attributed to medical diagnosis and treatment playing out over days of observation and trial and error. Indeed, the total time between when Plaintiff first complained of pain and when he received his first surgery was but thirty-seven days, and, during those thirty-seven days (most notably during his treatment by Defendants), he was never without documented medical treatment--either having seen a medical professional within the past few days or taking prescribed medication intended to help. Plaintiff may further argue that the diagnosis and treatment he received was not perfect or what he would have hoped for; however, that is not the standard upon which to measure these facts.

Further, Plaintiff has done nothing but guess that if he (1) had been assigned a bottom bunk sooner or (2) been assessed differently for pain medication (which clearly was not flatly denied as Plaintiff suggests) or (3) not been required to walk on "unstable legs," he would have had any better outcome to his situation than he has had. None of these three factors going to the heart of Plaintiff's claims appear from Plaintiff's arguments or (lack of) evidence to have caused him perceptible injury.

Plaintiff cannot rest upon the mere allegations in his Complaint and, instead, must come forward with admissible evidence showing a genuine issue remaining for trial. Plaintiff's response to Defendants' summary judgment motion does not identify any material facts in dispute. Instead, his response confirms that he received adequate medical care and that summary judgment for Defendants is appropriate.

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**. (Docket No. 32.)

DATED this 11th day of March, 2014.

BY THE COURT:

*Dale A. Kimball*

DALE A. KIMBALL
United States District Judge